**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| L.W. and J.W. o/b/o R.W., | : | |
| | : | Civil Action No. 11-2246 (SRC) |
| Plaintiffs, | : | |
| | : | **OPINION** |
| v. | : | |
| | : | |
| NORWOOD BOARD OF EDUCATION, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

**CHESLER**, District Judge

This matter comes before the Court upon the parties' cross-motions for summary

judgment [docket entries 18 & 19].[1]  The Court has considered the papers submitted by the

parties in connection with the instant motions, and pursuant to Federal Rule of Civil Procedure

78, rules without oral argument.  For the reasons discussed below, the Court denies Plaintiffs'

motion [docket entry 18] and grants judgment in favor of Defendant [docket entry 19], pursuant

to Federal Rule of Civil Procedure 56(a).

---

[1] Plaintiffs actually styled their motion as one for "Judgment on a Stipulated Record."
[See docket entry 18.] They claim entitlement to the relief sought in the Complaint based solely
on the evidence in the administrative record and have not sought to introduce additional
evidence.  See, e.g., 20 U.S.C. § 1415(i)(2)(C) (providing that in a civil action brought under the
Individuals with Disabilities Education Act, the Court "shall receive the records of the
administrative proceedings" and "shall hear additional evidence at the request of a party.") The
Court must base its decision on a preponderance of the evidence.  Id.

## I.   BACKGROUND

This matter arises under the Individuals with Disabilities Education Act ("IDEA"), 20

U.S.C. § 1400, et seq.  The dispute involves a demand made by L.W. and J.W. for

reimbursement of tuition and other costs associated with their unilateral placement of their son,

R.W., at a private school during the 2009-2010 academic year, a placement the parents claim is

justified based on the alleged failure by Defendant Norwood Board of Education ("Defendant" or

the "School District") to offer R.W. an educational plan that complied with the IDEA.  Plaintiffs

L.W. and J.W. (collectively, "Plaintiffs" or "the parents") also seek an order directing R.W.'s

continued placement in an out-of-district school, at the expense of the School District.

Following an administrative due process hearing, Administrative Law Judge Leslie Z. Celentano

decided on January 18, 2011 that the parents were not entitled to reimbursement or continued

out-of-district placement for R.W.  The parents, on behalf of their son R.W., now appeal that

decision pursuant to the procedure established by the IDEA, 20 U.S.C. § 1415(i)(2)(A).  The

following synopsis of the relevant facts is derived from the Complaint and from the record of

administrative proceedings, a complete copy of which was supplied to the Court by the State of

New Jersey's Office of Special Education at the request of Plaintiffs.

R.W. was born on November 2, 2000 and was eight years old when this dispute began.

At all times relevant to this matter, he has resided in Norwood, New Jersey.  R.W. was first

classified as disabled under the IDEA by the School District on June 17, 2005 as "Pre School

Disabled."  He received individualized education plans ("IEPs") for every academic year

beginning in pre-kindergarten (2005-2006) through second grade (2008-2009).  The focus of this

dispute is the adequacy of the IEP offered for R.W.'s 2009-2010 year of instruction, which

depends in part on the progress and challenges R.W. experienced through implementation of the

preceding IEPs.  Thus, after providing a brief review of R.W.'s earlier school years and IEPs, the

Court will turn to a more detailed description of the disputed plan.

In the spring of 2006, prior to entering kindergarten, R.W. was re-classified under the

category of Communication Impaired.  Based on this classification, he was placed in the regular

kindergarten class for half the day and in the self-contained Language Learning Disability

("LLD") class for the remainder of the day for reinforcement of skills.  He also received out-of-

class support for speech, occupational therapy and physical therapy.

R.W.'s IEP for 2007-2008 placed him in the regular first grade class in the Norwood

elementary school, with the opportunity for pull-out instruction in the LLD for reinforcement of

skills.  Private evaluations obtained by R.W.'s parents in 2007 revealed that R.W. also had

Attention Deficit Disorder and pronounced language delays.  A revised IEP for first grade was

adopted in September 2007.  This IEP added various in-class supports for R.W., such as

extended time to complete work, assistance from an available aide and minimized transitions, as

well as pull-out instruction in the school's Resource Center for reading instruction according to

the Orton Gillingham method.  First grade proved to be successful for R.W., as confirmed by a

letter to R.W.'s first grade teacher from R.W.'s mother thanking the teacher for a wonderful year.

The parents and Child Study Team ("CST") for the School District agreed to continue a

similar IEP for R.W.'s second grade year, placing him in a mainstream class that also included an

aide.  The School District had offered LLD support as needed, but the parents had rejected LLD,

finding the environment too restrictive.  R.W. appears to have made progress with the second grade curriculum but struggled with math toward the end of the year.  With the parents' agreement, in May 2009, the School District incorporated Resource Center math into his program, in addition to the pull-outs for reading and language arts.  Other than requesting additional math support, the parents documented no criticism or insufficiency concerning R.W.'s second grade IEP.

Earlier in R.W.'s second-grade year, R.W.'s mother had requested that her son be re-evaluated.  Dr. Margaret Kelly Downey, R.W.'s developmental pediatrician, completed a neurodevelopmental re-evaluation of R.W. in March 2009.  Her report opined that R.W.'s progress in reading comprehension was impeded by his pragmatic language delays and that he displayed weakness in social skills.  Dr. Downey diagnosed R.W. as having Pervasive Developmental Disorder-Not Otherwise Specified and Attention Deficit Disorder, primarily inattentive.  While this diagnosis, according to Dr. Downey, was commonly considered an autistic spectrum disorder, she felt it more appropriate to consider it to be a communication disorder, which she explained as "not understanding how humans use language to communicate with each other."  (R-10 at 5.)  She felt that R.W. should receive increased language therapy in the area of pragmatic language and noted that he would benefit from placement in a quieter classroom due to his tendency to become distracted and to his need for extra time to process language.

As part of his overall re-evaluation, R.W. was also given psychological, learning and speech-language assessments.  The School District psychologist, Dr. Catherine Stanzione, found that R.W.'s "overall performance was affected by his attentional weaknesses and a low tolerance

for frustration." (P-4 at 4.) She also noted that he experiences anxiety when uncertain of

expectations or of his abilities to meet expectations. According to Dr. Stanzione's report, R.W.

stated that he was happy in school, but she noted that he was unable to engage his peers socially

even though he verbalized a desire to do so. The psychologist observed that the mainstream

setting was linked to more problematic behaviors for R.W. than his resource room setting, which

was quieter and socially less challenging.

A conference to discuss R.W.'s IEP for 2009-2010 was held on April 24, 2009. The

parents and the CST agreed that, based on Dr. Downey's recent evaluation, the most appropriate

classification for R.W. was autistic. The meeting, however, did not result in agreement regarding

an IEP. The CST presented the parents with two options for a third grade IEP: placing R.W. in

the self-contained LLD class for all academics, with mainstream opportunities for gym, lunch,

recess and other activities, or continuing his mainstream placement in the regular classroom with

an aide and Resource Center pull-out instruction in the areas of reading, language arts and math.

The parents, however, expressed dissatisfaction with the options presented but did not point to

specific objections to the program or request particular changes or services. Instead, they

informed the School District that they were contemplating an out-of-district placement for R.W.

According to testimony given at the due process hearing by Debra Cicchetti, a School District

social worker on R.W.'s CST, the School District participants at the IEP meeting asked the

parents what they did not like about the IEP proposals they were offered. Cicchetti further

testified that rather than provide feedback, L.W., R.W.'s father, stated "it's like shopping for a

car, we're just going to look around at different schools." ( Tr. 3/19/10 at 80:10-11.) The

parents, in fact, appeared with an advocate, Charles Ehrlich, who was involved with tutoring

students at the Community School, the out-of-district school the parents had already explored prior to the initial IEP meeting for 2009-2010 and in which the parents would ultimately place R.W.  They did not, however, disclose the advocate's affiliation with the Community School to the School District at that time.  J.W. left the meeting early, and as a result, none of the options to develop a suitable IEP meeting the parents' concerns could be fully addressed at the April 24, 2009 IEP meeting.  L.W. indicated he would discuss the options with his wife and they would get back to the School District with their response.  All in attendance agreed that another meeting would be necessary to finalize the IEP.

A few days after the meeting, the parents sent a letter confirming their rejection of the proposed options and indicating their desire for an out-of-district placement.  The School District was surprised by the parents' preference for a restrictive and non-mainstream environment.  Up until that time, the parents had consistently expressed their desire that R.W. remain in a mainstream class as much as possible and had avoided incorporation into the IEP of the in-district self-contained LLD class, even though such an option was always made available.  In May, the parents visited the Community School, and it further appeared that they were actively looking at various out-of-district schools in this time period, based on releases they signed permitting the School District to send out copies of R.W.'s records to other schools.

The parents and CST nevertheless convened for a second IEP meeting on June 16, 2009. The School District attempted to discuss options for the 2009-2010 IEP and made it clear that they were receptive to all comments and suggestions.  Cicchetti testified that a vast range of options could have been explored, including, for example, providing R.W. with a one-on-one aide in the mainstream classroom.  Again, however, the parents provided no feedback and did not

voice their concerns with the IEP proposals, even though asked by the CST.  The discussion focused on out-of-district programs, with no dialogue about the parents' perceived insufficiencies of the School District's ability to meet R.W.'s needs.  The June 2009 also failed to yield an IEP that could be finalized or, moreover, to yield any progress toward a final IEP.  R.W.'s mother did agree to observe the proposed self-contained LLD class, and this observation ultimately did take place in June.  At that time, the LLD class consisted of three adults (a teacher, a classroom aide and an aide for a particular child) and ten children classified as disabled under the IDEA, all of whom were in third through fifth grade.  Later, during the due process hearing, R.W.'s mother would explain in her testimony that she was dissatisfied with the LLD classroom setting because she found the variety of instruction being offered to children of different ages and abilities confusing and felt that it would not be a good fit for her son.  She did not make this concern known to the School District during the IEP development process.

The parents and the CST were unable to reach an agreement regarding R.W.'s IEP for 2009-2010.   It does not appear that the parents provided any comments to the School District about the draft IEP after observing the LLD room.  Instead, the parents filed their initial due process petition challenging the IEP on July 30, 2009, which was withdrawn and then re-filed in October of that year.

In August 2009, the parents sought a neuropsychological evaluation of R.W. from Elizabeth Roberts, Ph.D., of New York University.  Dr. Roberts found R.W. to be impulsive and emotionally volatile. She was of the opinion that his behavior hindered the aptitude testing she administered and interfered with obtaining an accurate assessment of his academic ability and potential.  She nevertheless concluded, based on a comparison of her test results to previous

evaluations undergone by R.W., that the "speech/language intervention he has received has not resulted in a reasonable rate of progress in this area." (P-11 at 9.) Dr. Roberts agreed that a self-contained classroom with few students, such as the proposed LLD room, would be necessary to meet his needs, but qualified this by noting that it would be appropriate "only if all of his classmates were at approximately the same academic, language, social, emotional, and intellectual level of functioning as he is and if the curriculum and therapies were specifically designed to meet all of this needs." (Id. at 15.)

After the June 16, 2009 IEP meeting, there appears to have been no further communication between the parents and the School District for the purpose of developing the IEP. Rather, over the summer months following second grade, the parents applied for R.W.'s admission to the Community School, an out-of-district placement. On August 28, 2009, the parents sent the School District a letter advising that the School District's failure to offer an appropriate program within 10 days would result in R.W.'s placement at the Community School, by unilateral decision of the parents. In September 2009, R.W. enrolled in the Community School.

## II.    DISCUSSION

### A.    Right To Reimbursement Under the IDEA

As a condition of receiving federal funds for special education services, states and school districts are required under the IDEA to provide a free appropriate public education ("FAPE") to all resident children with disabilities, as defined by 20 U.S.C. § 1401.  20 U.S.C. § 1412(a).  A FAPE, according to the Supreme Court's interpretation of the IDEA, "consists of educational

instruction specially designed to meet the unique needs of the handicapped child, supported by

such services as are necessary to permit the child 'to benefit' from the instruction." Bd. of Educ.

of the Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 188-89 (1982).  While a

FAPE must do more than provide a trivial educational benefit, it need not maximize the child's

potential to satisfy the requirements of the IDEA.  L.E. v. Ramsey Bd. of Educ., 435 F.3d 384,

390 (3d Cir. 2006).  The standard of an adequate FAPE is one that confers a "meaningful"

educational benefit.  Id.  Moreover, the IDEA involves a mainstreaming component, which

requires that the FAPE be delivered in the "least restrictive environment." D.S. v. Bayonne Bd.

of Educ., 602 F.3d 553, 556-57 (3d Cir. 2010); see also 20 U.S.C. § 1412(a)(5)(A).  "The least

restrictive environment is one that, to the greatest extent possible, satisfactorily educates disabled

children together with children who are not disabled, in the same school the disabled child would

attend if the child were not disabled." Carlisle Area Sch. Dist. v. Scott P., 62 F.3d 520, 535 (3d

Cir. 1995).

        For each child identified as eligible for special education, the IDEA requires that a written

statement called an individualized education plan ("IEP") be developed.  20 U.S.C. § 1412(a)(4).

It must include a statement of the child's current level of academic achievement and functional

performance, outline the goals that will enable the child to make progress in his or her curriculum

and detail the special education and related services that will be provided to meet these goals. 20

U.S.C. § 1414(d).  The IEP must be designed to ensure implementation of a FAPE for the child.

D.S., 602 F.3d at 557.  The IEP, in other words, "must be 'reasonably calculated' to enable the

child to receive 'meaningful educational benefits' in light of the student's 'intellectual

potential.'" Shore Regional High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004)

(quoting Polk v. Cent. Susquehanna Interm. Unit 16, 853 F.2d 171, 181 (3d Cir.1988)).

The Supreme Court has recognized that parents who disagree with an IEP have a right to make the unilateral decision to withdraw their child from public school and place the child in private school. Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S.359, 364-65 (1985). Parents who unilaterally place their child in a setting contrary to the IEP may be entitled to reimbursement "if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." Id. at 369; L.E., 435 F.3d at 389 (3d Cir. 2006); see also 20 U.S.C. § 1412(a)(10)(C). The Supreme Court of New Jersey has further required parents seeking reimbursement to demonstrate that they have acted in good faith. Lascari v. Bd. of Educ. of Ramapo Indian Hills Reg. High Sch. Dist., 116 N.J. 30, 50 (1989). To determine whether a school district must pay for the private placement of a child living within the area served by that school district, this Court must apply the standard set forth in Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 (1993). See Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 248 (3d Cir. 1999). The Florence County standard has been summarized by the Third Circuit as follows:

> [A] student may be entitled to reimbursement if "a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under [IDEA]." Under *Florence County*, a court may award a disabled student the cost of his private placement if (1) the court determines the student's IEP is inappropriate and (2) the student demonstrates that the private placement he seeks is proper. A private placement may be proper if it is appropriate and provided in the least restrictive educational environment. To meet the *Florence County* standard, a disabled student is not required to demonstrate that he cannot be educated in a public setting. Under IDEA, the relevant question is not whether a student could in theory receive an appropriate education in a public setting but whether he will receive such an education.

Id. at 248-49 (citations omitted).

10

B.        Challenging Denial of a FAPE: The Due Process Hearing

When a parent believes a school district has not provided their child with a FAPE, he or she, upon request, shall receive the opportunity for a due process hearing. 20 U.S.C. § 1415(f); see also Lascari, 116 N.J. at 36 (citing applicable New Jersey state regulations).  In this case, the parents filed a petition for due process, contending that the School District failed to offer R.W. a FAPE and seeking (1) reimbursement for tuition and expenses incurred in connection with their unilateral placement of R.W. at the Community School and (2) continued placement of R.W. at the Community School.  The petition was transmitted to the Office of Administrative Law, and a hearing was held over various days before ALJ Leslie Z. Celentano.  The School District presented the testimony of eight witnesses, including the members of the CST familiar with R.W.'s IEPs, R.W.'s second grade teacher, the LLD room teacher and Dr. Downey.  The parents also presented a number of witnesses, including R.W.'s mother, his treating psychiatrist Dr. Arturo Marrero-Figarella and Dr. Roberts, the clinical neuropsychologist who evaluated R.W. immediately preceding his out-of-district placement.

ALJ Celentano found that the evidence demonstrated that R.W. had been making progress through the implementation of his IEPs in first and second grades and that pullouts from the mainstream class were added at the end of second grade to address his difficulties in language arts and math.  She determined that the School District's two IEP proposals for third grade were consistent with his performance and with the needs and challenges he displayed.  The ALJ also took note of the parents' apparent lack of cooperation in fashioning an IEP that they would consider to be appropriate, observing that they rejected LLD supports even though they had not tried this special service over the years that it was made available to them and to their son.  She

further observed that the parents' request for the out-of-district placement in the Community

School was at odds with their insistence that R.W. be educated in the least restrictive

environment, noting that the out-of-district placement was a very restrictive environment with no

opportunity for mainstreaming with non-disabled peers.

The ALJ ultimately concluded that the proposed IEP for 2009-2010 constituted a FAPE,

as defined by the IDEA, and that the parents were therefore not justified in receiving public funds

to pay for their out-of-district placement. The ALJ held as follows:

> The district IEP proposals took into consideration Dr. Downey's
> observations as to R.W.'s availability for learning and were designed to
> promote his social awareness and pragmatic communication skills.  These
> were the deficits that all parties uniformly agreed required remediation in
> order for R.W. to experience educational success.  I CONCLUDE that the
> IEP proposed by the district for the 2009-2010 school year would have
> conferred a meaningful educational benefit on R.W.  I further
> CONCLUDE that the district program was the legally correct placement
> because, as a public-school placement, it constituted the least restrictive
> environment appropriate to R.W.'s needs . . . Having found that the district
> offered FAPE to R.W., it is unnecessary to analyze further whether the
> Community School program was appropriate under the IDEA.  R.W. did
> well there, and the program offered many supports.  But it is well-
> established that the appropriateness of an IEP is not determined by a
> comparison of the private school program and the program proposed by
> the district.

(1/18/11 ALJ Decision at 44-45.)

She further found that the parents' behavior during the IEP development process

displayed a lack of good faith and essentially frustrated any possibility of designing a suitable

IEP for R.W.  She found that the evidence demonstrated that the parents withheld critical

information from the School District about their search for out-of-district programs and failed to

engage in any constructive dialogue with the School District about their critique of the IEP

proposals and/or their belief that R.W. had needs that the School District could not address.

Following her detailed summary and review of the testimony of numerous witnesses, the ALJ

held as follows:

> Some time before the April 24, 2009 IEP conference, petitioners had
> begun to seek services elsewhere, with alternative-school programs, all
> without any notice to the district.  They retained experts and an attorney,
> but never shared with district personnel their dissatisfaction, or their belief
> that R.W. needed something different than the district could offer.  This
> lack of collaboration continued until the April 2009 IEP meeting and
> beyond.  Petitioners did not criticize any of the options offered nor request
> any changes, additions or deletions, nor seek to work in partnership with
> district staff; rather, they went through the motions of listening to a
> discussion of program options that they had fully anticipated rejecting
> before entering the room.  They did not tell the district that they were
> dissatisfied with the district program until at that meeting, yet still failed to
> articulate what their concerns were.

(Id. at 45-46.)   She ultimately concluded that "[t]he petitioners were justified neither in their

unilateral placement nor in their failure to continue to collaborate with district personnel.  I

CONCLUDE that petitioners have not demonstrated an entitlement to reimbursement for the

expenses attached to R.W.'s attendance at the Community School." (Id. at 46.)

### C.    Standard of Review

Plaintiffs initiated the action, pursuant to the procedure established by 20 U.S.C. §

1415(i)(2), seeking review and reversal of the ALJ's decision denying their request for

reimbursement for the unilateral private school placement of R.W.  It is essentially an appeal of

the administrative decision.  The standard of review that a district court must apply in a civil

action challenging an IDEA administrative decision has been described as "unusual." Shore, 381

F.3d at 199.   Unlike judicial review of other agency actions, in which the court is held to a

highly deferential standard of review, an action brought under the IDEA requires the district

13

court to conduct a "modified de novo review." S.H. v. State Operated Sch. Dist. of City of Newark, 336 F.3d 260, 270 (3d Cir. 2003).  Under this standard, the district court must make its own findings by a preponderance of the evidence while at the same time affording "due weight" to the ALJ's determination.  Shore, 381 F.3d at 199 (citing Rowley, 458 U.S. at 206).  "Due weight" means that the district court should consider the ALJ's factual findings to be prima facie correct but is not required to adhere to them.  Id.  If the reviewing court fails to adhere to them, it must give reasons for its departure.  Id. (citing S.H., 336 F.3d at 271.)

### D.     Analysis

To determine whether the parents are entitled to reimbursement for 2009-2010, the Court must address the threshold issue of whether the IEP was reasonably calculated to provide a FAPE for that school year.  Shore, 381 F.3d at 198 ("In a case in which parents seek reimbursement for a unilateral placement, the District Court must first determine whether the IEP afforded the student a FAPE.").  Consistent with New Jersey legislation, the School District bears the burden of proving that the proposed IEP satisfied the FAPE requirement.  N.J.S.A. 18A:46-1.1 (enacted subsequent to the Supreme Court's decision in Schaffer v. Weast, 546 U.S. 49 (2005), which, in the absence of a statutory directive to the contrary, placed the burden on the party seeking relief).  The question before this Court, in its role pursuant to 20 U.S.C. § 1415(i)(2)(C), is whether the ALJ's determination of this issue is supported by the evidence presented to her in the due process hearing below and is consistent with the requirements of the IDEA.

The Court has carefully reviewed the record and ALJ Celentano's thorough opinion.  It has also reviewed the parties' written submissions concerning the issue of whether the ALJ correctly decided the due process petition for reimbursement.  The Court feels compelled to note

14

the utter absence in Plaintiffs' briefs of any discussion of the ALJ's findings of fact.  As the

Court recited earlier, factual findings by an ALJ deciding an IDEA due process petition are to be

considered prima facie correct, yet Plaintiff engages in no critique indicating how, in their view,

the ALJ's findings were contrary to the evidence presented.  This failure to address the decision

under review is especially glaring in light of the extensive testimony on which the ALJ based a

large part of her factual findings.  The Third Circuit has emphasized that an ALJ's

determinations based on live witness testimony are due "special weight," as the ALJ is in a

superior position to assess a witness's credibility.  Shore, 381 F.3d at 199; see also Carlisle Area

Sch. v. Scott P., 62 F.3d 520, 530 n.4 (3d Cir. 1995) (observing that lessened deference owed to

administrative findings that do not turn on credibility judgments).

Giving the factual findings of the ALJ the deference to which they are entitled, the Court

agrees with those findings and concludes that the ALJ's determination that the School District

demonstrated that its 2009-2010 IEP was proper under the IDEA is amply supported by the

record.  The evidence shows that while R.W. was making progress in the mainstream setting

during second grade, he was struggling in the areas of language arts and math.  Both IEP

proposals for 2009-2010 targeted those deficits by offering a choice between LLD instruction for

all academics or continued mainstream instruction with pull-outs in the areas requiring

reinforcement.  Though, as the Court will discuss below, the CST and others believed the LLD

class to be a better fit for R.W., the presentation of options for the 2009-2010 would appear to

reflect the School District's flexibility and its understanding of the parents' preference, up until

that point, that R.W. remain mainstreamed with his non-disabled peers as much as possible.

15

The ALJ's findings and conclusions took into account the testimony of many witnesses. Though R.W.'s mother and his treating psychiatrist, Dr. Marrero-Figarella, expressed their view that the School District could not meet R.W.'s needs and that a private placement with an all-disabled student body was more suitable, most of the witnesses supported the IEP proposals based on their firsthand knowledge of R.W.'s disabilities. The Court notes that R.W.'s mother testified at the due process hearing that her son was very unhappy at the Norwood public school during second grade and attributed this to anxiety over his academic struggles and instances of bullying. The ALJ explained her reasons for giving little weight to the testimony of R.W.'s mother, noting that all her objections to R.W.'s in-district education were expressed in a belated manner at the due process hearing, had not been voiced prior to or during the development of the 2009-2010 IEP and were at odds with the input she had offered regarding R.W.'s first and second grade years, particularly insofar as the parents had always insisted on maximum mainstreaming for R.W. Indeed, the ALJ aptly observed that the parents had failed to engage in a good faith effort to develop an appropriate IEP for R.W. for 2009-2010 and had participated in the process pre-disposed to reject any of the School District's proposals. The Court agrees, as the record makes it very clear that the parents did not collaborate in the least with the School District.

The members of R.W.'s CST strongly supported the LLD placement as it offered all-day multisensory instruction in a small class setting, integrated social skills into the program and employed a teacher certified in the Orton-Gillingham remedial reading method. These various supports incorporated within the LLD class, the Court concludes, were reasonably calculated to address both R.W.'s academic deficiencies as well as his communication struggles and difficulty with excessive transition. Dr. Downey, who was very familiar with R.W. as one of her own

16

patients for years and who performed both the 2006 evaluation and the 2009 reevaluation, testified that she recommended that R.W. have one teacher all day because of his transition difficulties. The parents' own expert, Dr. Roberts, testified that R.W. should "be placed in a language enriched setting in which [his] developmental language disorder and his pragmatic impairments would be addressed in a continuous way throughout the school day by all instructors." (Tr. 6/23/10 at 33:23 - 34:3.) These independent recommendations were consistent with the School District's proposal for LLD placement in the draft 2009-2010 IEP.

The evidence of R.W.'s educational experience in the years leading up to the development of the proposed IEP for 2009-2010, his 2009 reevaluation and the testimony of the CST, his teachers and his own treating physician overwhelmingly support the conclusion that the IEP proposals were designed to meet R.W.'s unique academic and social needs. Both proposals, moreover, included generous opportunities for R.W. to be mainstreamed with nondisabled peers. Even in the option for all academic instruction to be delivered to R.W. in the self-contained LLD classroom, R.W. would have had homeroom, lunch, recess and all "specials" in a mainstream setting. In short, the Court finds that the proposed IEP would have conferred a meaningful educational benefit on R.W. in the least restrictive environment.

As the ALJ held, the determination that the School District's proposed IEP was reasonably calculated to provide R.W. with a FAPE defeats the parents' claim for reimbursement. This Court, and the administrative court below, properly avoid making determinations as to whether the unilateral private placement chosen by the parents confers a better education on the child. The Third Circuit has held that the issue in evaluating whether an IEP satisfies the IDEA is not a comparison of placements, stressing that the IDEA guarantees a

meaningful educational benefit, not the best possible education.  See S.H., 336 F.3d at 271.

Under the Florence County standard of parents' entitlement to reimbursement, the

appropriateness of the private placement does not become relevant unless and until a court

determines that the IEP fails to comply with the IDEA's FAPE requirement.

Here, the evidence demonstrates that the challenged IEP, for 2009-2010, was crafted to

meet R.W.'s academic and behavioral challenges and to afford him a meaningful educational

benefit.  Moreover, it aimed to do so in a manner that maximized R.W.'s interaction with his

peers in a mainstream environment.  The School District, in short, has established by a

preponderance of the evidence that the IEP was reasonably calculated to provide R.W. with a

FAPE in the least restrictive environment, as required by the IDEA.  Pursuant to 20 U.S.C. §

1412(a)(10)(C) and Florence County, the parents are not entitled to reimbursement for unilateral

placement of R.W. at the Community School for 2009-2010.  In light of this, the Court concludes

that the ALJ's decision  must be upheld under the IDEA's standard of modified de novo review.


**III.   CONCLUSION**

For the foregoing reasons, this Court will grant summary judgment in favor of Defendant,

and deny Plaintiffs' motion for judgment on a stipulated record.  An appropriate form of order

will be filed together with this Opinion.

>    s/Stanley R. Chesler
> STANLEY R. CHESLER
> United States District Judge


DATED: February 17, 2012